# Case No. 2,350.

## CAMPBELL v. The ALKNOMAC.

[Bee, 124.][1]

District Court, D. South Carolina. Nov. 25, 1798.

CHARTER PARTY — BARRATRY OF MASTER AND CREW—REPAIRS TO VESSEL—DEVIATION.

Owner of a vessel not liable for barratry of captain and crew, beyond the sum mentioned in the charter-party: nor to repairs of the ship, if [unless] warranted by the owner to be kept staunch during the voyage. But in case of loss and expense by necessary deviation, both vessel and cargo must contribute in general average.

[See Arthur v. The Cassius, Case No. 564; Donahoe v. Kettell. Id. 3.980; The Casco. Id. 2,486; The Star of Hope, 9 Wall. (76 U. S.) 203; The Joseph Farwell, 31 Fed. 844; Potter v. Ocean Ins. Co.. Case No. 11.335.]

In admiralty.

Before BEE, District Judge.

This ship, belonging to Mr. Wood, of the state of Massachusetts, and of which Wheelwright was master, was chartered on the 30th January 1797, in the port of Liverpool,

[1] [Reported by Hon. Thomas Bee, District Judge.]

by Anderson and Child, agents, and Wheelwright, master, in behalf of the owner, to Campbell, Harvey and Co. merchants of Charleston; who, by the words of the charter-party, were to have the whole reach and burden of the ship (except the cabin and sufficient room for crew, stores, &c.) on a voyage from Liverpool to Greenock, then to Charleston; from thence to Cowes, Cork, or some other port in Europe, at certain stipulated freights. The vessel to be at the expense of the owner and master, and to be kept tight, staunch, and strong, well manned, victualled, tackled, and provided in every respect for such a voyage in the merchant service. For the performance of covenants in the charter-party, each party was bound in a penalty of £500 sterling, to secure which, the agents of the owner and the captain bound the ship; and the freighters, the goods to be laden on board. In pursuance of this agreement the ship proceeded from Liverpool to Greenock, and after taking in a full load of goods, sailed for Charleston about the 3d April 1797. After proceeding nearly two thirds of the voyage, she was captured by a French privateer, and ordered to Nantz. Fourteen days after this, she was recaptured by a British sloop of war, and sent to Cork, where she arrived on the 30th May. Here the agents for the freighters paid the requisite salvage for ship and cargo, and she sailed again for Charleston in August; but, meeting with bad weather and contrary winds on this coast, was compelled to put into Norfolk, in distress, in the beginning of November. It is in evidence that when the ship arrived in Hampton Roads, all the crew, except the two mates, left her. The captain, who was in bad health, went to Norfolk, and there prevailed on a Mr. Dana to act as agent. By his direction three several surveys were made, in consequence of which it was thought fit to land the cargo, that the vessel might be repaired and refitted for proceeding to Charleston. Some parts of the cargo were found damaged: other parts had been plundered, and some goods were missing. Sundry articles sold, or offered for sale, by the seamen on shore, were seized and libelled in the district court of Virginia, as forfeited under the trade laws of the United States; but that court, being satisfied that they had been purloined from the cargo, ordered them to be given up to the agent. As soon as it was discovered that many of the goods were missing, the captain and both mates followed the example of the others of the crew; left the vessel, and quitted Norfolk. The agent, therefore, hired another captain and crew, who brought the vessel to Charleston in February following. It appears, also, that Mr. Dana sold at public auction such parts of the cargo as were damaged. to the amount of £3855 Virginia currency; out of which he reimbursed himself for repairs and outfits of the ship at Norfolk, to

the amount of £700 sterling. For repayment of this sum, and for the deficiency of goods landed at Norfolk ascertained by the manifest and bills of lading, this suit is brought.

The claimant contends that the amount of repairs at Norfolk, having been occasioned by tempestuous weather, must be brought into general average. That any deficiency in the cargo must be attributed to the vessel's having been twice captured. That the master could not prevent plunder or spoliation when he was not in possession of the vessel; and that the freighters of the whole vessel, must be considered as owners for this voyage, and, as such, have a remedy against the insurers, and are liable to other persons who had goods on board. That, at all events, Wood's responsibility is limited by the charter-party. As to the liability of Campbell and Harvey as owners pro hac vice, cases were quoted from Park, Cowper, and Magens. But these all related to insurance, and only shew that in case of deviation, considered as barratry, the insurers, shall not be discharged from their insurance of owners pro hac vice, unless consent of such owners to the deviation can be proved. The consent of the real owner was determined not to discharge the insurers. How is the case here? The owners pro hac vice had no control over the master; they did not appoint, nor could they discharge him; and, of course, shall not be liable for his acts. By the terms of the charter-party the ship was to be kept tight, staunch, &c. for the voyage; the owner therefore must bear the damages. All necessary charges of unloading, reloading, anchorage, pilotage, storage, wharfage, and other such expenses incurred at Norfolk, together with wages and victualling of the crew from the day of consultation on board at sea as to seeking a port, till the day of her leaving Norfolk to return here, must be brought into general average. The difference between their own share of these charges, and the amount of goods sold at Norfolk must be paid to the actors in this cause.

The last point for my determination relates to the barratry committed by the master and crew. Is the owner of the ship liable for this? and to what amount? There is a clear deficiency of thirty-six boxes, trunks, &c. said to be worth £3500 sterling. This appears from a comparison of the manifest signed by the captain, with the report of a person employed by the agent at Norfolk, under the direction of a custom-house officer. But it is said that this proceeded from the double capture of the vessel. If so, it must have happened before the captain made his protest at Cork. He there mentions a quantity of porter drunk by the French; but not a word of any spoliation by the British: if any had taken place it might and ought to have been ascertained by survey, before the salvage was fixed and paid. Nothing said by the captain can countervail his protest.

It appears, however, that three boxes were sold at Cork, by the captain, for his own use. He confesses this; and that the sale produced £180. Goods to a considerable amount were found on two of the seamen at Norfolk, and the decree of the district court there restored them as parts of the cargo. There is no direct proof that the others carried off their share; but it will hardly be doubted, when we consider that many bundles and boxes were found broken open and robbed, when the vessel was first boarded at Norfolk; and that all the seamen left her as soon as she arrived there, and were soon followed by the captain and both mates.

Indeed, so strong is my conviction upon this point that I should not hesitate to make the ship liable to the full amount of her value, if the charter-party were out of the way. But the parties have thereby fixed their own damages, and I cannot exceed them. Let this ship be sold, and from the proceeds let the actors receive the sum of £500 together with all expenses incurred at Norfolk by the unloading, and detention of the vessel, beyond what they are bound to pay in general average. Let a statement of the amount be made by the register, and enrolled with this decree.

NOTE [from original report]. The vessel sold for six thousand dollars. The marshal paid to Campbell and Harvey the following sums:

| | |
|---|---:|
| Penalty fixed by charter-party..... | £ 500 |
| Amount of repairs, deducted from sale of part of the cargo............ | 548 |
| Ship's share of general average..... | 43 |
| | £1091 |